L. M. MULDROW AND HELEN B. MULDROW, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79017. Filed September 21, 1962.

*Maurice F. Bishop, Esq.*, for the petitioners.
*William E. McCormick, Esq.*, for the respondent.

## OPINION.

Turner, *Judge:* It is the position of petitioner that to the extent of the proceeds from the sale of the 812 bales of cotton illegally taken and sold from his warehouse his cotton sales as reported in his 1955 return were overstated and should be adjusted to eliminate the $137,642.12 received therefor. In short, it is his contention that the said sales proceeds should be excluded in arriving at his gross income. As the basis for the claim, it is said that petitioner never held the funds under any claim of right but has forthrightly admitted his indebtedness to the legitimate holders of uncanceled warehouse receipts, that he in fact conveyed all of his assets to a trustee for the benefit of the "admitted and recognized claim holders" and having filed his return

on an accrual basis and the sales proceeds thus not being his, sales should be reduced in the amount stated by its elimination.

The difficulty with the contention is that certain of the material facts are not shown of record as counsel states them and the argument advanced is strongly reminiscent of the reasoning in *Commissioner* v. *Wilcox*, 327 U.S. 404, overruled in *James* v. *United States*, 366 U.S. 313. In the *James* case, Chief Justice Warren in his opinion said:

> When a taxpayer acquired earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North American Oil* v. *Burnet, supra,* at p. 424. In such case, the taxpayer has "actual command over the property taxed—the actual benefit for which the tax is paid," *Corliss* v. *Bowers, supra.* * * *

During the taxable year petitioner sold for his own account 812 bales of embezzled cotton, for which he received likewise as his own $137,-642.12. He deposited these funds in his personal bank account and had unrestricted use of them throughout the taxable year and, to the extent not previously lost or dissipated, during 1956 and 1957 and in 1958 at least until the time his defalcations were discovered. There is no showing of any recognition, consensual or otherwise, of an obligation to pay over any of the funds to the rightful owners of the cotton or of any holding of the funds for them until after his misdeeds caught up with him in 1958. And, under the *James* case, any such belated acknowledgment of liability may not be related back to the year of conversion, and that regardless of whether the taxpayer used an accrual or cash method of accounting in reporting his income.

The respondent did not err in failing to exclude from gross income the proceeds from the sale in 1955 of the 812 bales of converted cotton.

With respect to the losses sustained by petitioner in his buying and selling of cotton futures contracts, the parties are in apparent agreement that if petitioner's futures transactions were bona fide hedging transactions, his losses thereon in 1955 were deductible in full and are not subject to the statutory limitations on the deduction of capital losses. The petitioner makes a further claim, however, that even if his transactions in cotton futures were not "true" hedges, they were an integral part of his regular business and under the decision of the Supreme Court of the United States in *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46, the losses thereon were ordinary losses and deductible in full.

Noting that the Supreme Court in *United States* v. *New York Coffee & Sugar Exchange*, 263 U.S. 611, had pointed out that there were three general classifications of dealings in commodity futures, namely, speculation, legitimate capital transactions, and hedging, the United States Court of Appeals for the Second Circuit, in its opinion

in *Corn Products Refining Co.* v. *Commissioner*, 215 F. 2d 513, affirmed by the Supreme Court at 350 U.S. 46, stated: "These classifications have since been adopted as convenient nominal guides by the courts to determine the proper tax consequences of futures transactions. Where futures are dealt with for the purposes of speculation or what is called legitimate capital transactions, they obviously fall outside the possibly relevant exclusions of Section 117(a)."

A hedge, on the other hand, is not a transaction looking to a favorable fluctuation in price for the realization of profit on the particular futures contract itself, as in the case of a speculative or capital transaction, but is a form of insurance against unfavorable fluctuations in the price of a commodity in which a position has already become fixed or, as in the case of a producer such as a cotton grower, will become fixed in normal course and the sale, liquidation, or use of the commodity is to occur at some time in the future. See *Fulton Bag & Cotton Mills*, 22 T.C. 1044, where the taxpayer was a manufacturer of cotton bags and by transactions in cotton futures sought to protect its inventory of raw cotton against a possible decline in the market price; *Stewart Silk Corporation*, 9 T.C. 174, where a silk manufacturer, which was meeting increased sales resistance to its manufactured products from manufacturers of synthetic fabrics, sold futures in raw silk for the purpose of protecting its raw silk inventory from unfavorable fluctuations in price; *Kenneth S. Battelle*, 47 B.T.A. 117, where cotton futures were sold by a cotton farmer to offset production risks on cotton he was producing and would have on hand for sale at a later date; *Ben Grote*, 41 B.T.A. 247, a wheat farmer who sold wheat futures to protect against the possibility of an unfavorable price at the time his wheat crop would be ready for market; and *Sicanoff Vegetable Oil Corporation*, 27 T.C. 1056, reversed on other grounds 251 F. 2d 764, wherein, at page 1067, we described hedging transactions as follows:

Generally, where a hedge is made, a position is taken in the futures market to offset a risk with respect to actuals. The purchase or sale of a futures contract to offset the risk of holding another futures contract does not ordinarily qualify as a bona fide hedge—for such risk is a speculative one, and is not attached to the holding of a commodity expected to be used or marketed in a business.[3] The authorities indicate that, in order to have a bona fide hedge, there must be: (1) A risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt to so shift the risk.

[3] The Treasury regulations recognize that it is possible to have a hedge against concurrent futures. Regs. 111, sec. 29.502–1(6). But the expert testimony herein indicates that this can occur only in unusual circumstances—as for example, where one has hedged a risk in an actual, by buying futures; has found, after the risk in the actual has expired, that he cannot "lift" the hedge, because of the narrowness or the closing of the market in which the futures were acquired; and, hence, that in order to obtain protection, he must go to a different market to buy or sell offsetting futures.

The only evidence of record which even tends to show that petitioner's transactions in cotton futures were hedges is that petitioner, by form letters, had represented to brokers that the transactions in cotton futures in which he would request "exemption from the original margin requirements" covered by a designated rule of the exchange, would fall into one or more of the categories listed in the form letters as hedges; that in initiating the said transactions herein with the brokers he had designated them as hedging transactions and the carrying futures broker, in each instance, had carried the transactions as hedges on its books and records. There is no suggestion or claim that the brokers required any showing or made any determination that the transactions were in fact hedging transactions.

On the other hand, the facts which are shown relative to petitioner's operations and to the transactions themselves fail to disclose any basis or justification for designation of the futures transactions as hedges. Petitioner had no inventory of spot cotton at the beginning or close of the taxable year, and unless there was in fact a purchase of 267 bales to cover a sale made to Duncan Cotton Company in 1953, he made no purchase of spot cotton during the taxable year. He was not a producer or processor of cotton. He owned no cotton during the year and his only sales for his own account were the sales of 812 bales of embezzled cotton. It is true that he had bought, and presumably sold, some spot cotton in the 4 years preceding the taxable year. But there is no proof to show that his transactions in cotton futures even in prior years, to say nothing of such transactions in the taxable year, were in any respect hedges connected with his purchases of spot cotton. Such being the state of the record, we may not properly conclude that the transactions herein were in fact hedging transactions, rather than a speculative buying and selling of futures by petitioner.

What we have said above also disposes of the contention that if the futures transactions were not "true" hedging transactions, they were an integral part of petitioner's warehouse business and that the losses sustained were ordinary losses under the decision of the Supreme Court in *Corn Products Refining Co.* v. *Commissioner, supra.* Not only is there no showing that the futures transactions were an integral part of or even related to petitioner's warehouse operations, but the facts which are of record tend to show that they were not.

Petitioner's final contention is that his activities covering his cotton futures transactions occupied most of his working time, and accordingly were such as to make those activities, in and of themselves, the conduct of a business, to the end that the losses sustained were losses incurred in the ordinary course of a business regularly carried on, and were deductible as such.

The same argument was advanced and rejected in *Farroll* v. *Jarecki*, 213 F. 2d 281, certiorari denied 252 U.S. 830. In that case, Farroll, the taxpayer, during the taxable year entered into more than 10,000 separate transactions involving approximately 81 million bushels of grain and amounting to more than $84 million. He averaged at least 41 separate transactions and over $340,000 of commitments per day. He was a general partner in a brokerage firm, but entered into the transactions in question for his own account. The court held the losses sustained were capital losses within the meaning of the statute, not ordinary losses. To the same effect is *Craig M. Smith*, 33 T.C. 465. See also *O. L. Burnett*, 40 B.T.A. 605, affirmed on this issue 118 F. 2d 659.

We accoardingly conclude and hold that petitioner's losses during the taxable year on his trading in futures contracts were capital losses, and are not deductible as ordinary business losses.

*Decision will be entered under Rule 50.*